IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2015

## STATE OF TENNESSEE v. JASON LYLES

**Appeal from the Circuit Court for Maury County**
**No. 22121     Stella Hargrove, Judge**

_____

**No. M2014-02618-CCA-R3-CD – Filed June 5, 2015**

_____

Appellant, Jason Lyles, was convicted by a Maury County jury of two counts of facilitation of sale of cocaine, a Schedule II controlled substance, in an amount of 0.5 grams or more in a drug-free zone, a Class C felony; one count of sale of cocaine in an amount of 0.5 grams or more in a drug-free zone, a Class B felony; and one count of sale of cocaine in an amount of 0.5 grams or more, a Class B felony.  The trial court sentenced him to concurrent terms of three years, three years, and eight years (at 100% release eligibility) and a consecutive sentence of ten years, suspended to probation, respectively.  In his motion for new trial and in this appeal, appellant presents one issue: whether the trial court erred in declining to instruct the jury on the lesser-included offense of simple causal exchange.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Douglas K. Chapman (on appeal), and Jacob Jackson Hubbell (at trial), Columbia, Tennessee, for the appellant, Jason Lyles.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; T. Michel Bottoms, District Attorney General; and Brent A. Cooper, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

This case involves four undercover drug transactions between appellant and a confidential informant that were supervised by the Columbia Police Department narcotics division.

## I. Facts

### A. Trial

The State called Special Agent Forensic Scientist John Scott as its first witness, and the trial court accepted him as an expert in the field of forensic chemistry with a concentration in the identification of controlled substances. Special Agent Scott identified the two samples of "chunky powder" that were submitted to him as cocaine, a Schedule II controlled substance, and recorded their individual weights as 0.66 grams and 0.74 grams. Special Agent Forensic Scientist Jennifer Sullivan testified next and was also accepted by the trial court as an expert in the field of forensic science with a concentration in the identification of controlled substances. Special Agent Sullivan identified one sample of an unknown substance that was submitted to her as cocaine, a Schedule II controlled substance, and recorded the individual weight as 1.03 grams. Special Agent Forensic Scientist Glen Jay Glenn, who was also accepted by the trial court as an expert in the field of forensic science with a concentration in the identification of controlled substances, tested the fourth sample and identified it as cocaine, a Schedule II controlled substance, with a weight of 0.86 grams. The State established the chain of custody for the above evidence through the testimony of Columbia Police Department Officer Jeremy Humphrey.

The State called Kevin Odie as its next witness. Mr. Odie had three felony drug charges pending at the time of trial and had three prior convictions for drug-related offenses, one of which resulted in an eleven-year prison sentence. For that reason, Mr. Odie sought out Officer Jason Dark with the Columbia Police Department and offered to assist him in undercover drug operations. Accordingly, Officer Dark asked Mr. Odie to "'make a few buys,'" and Mr. Odie named individuals, including appellant, from whom he believed he could purchase either marijuana or cocaine.

Mr. Odie testified that prior to June 15, 2012, he spoke with appellant about purchasing a gram of "powder" cocaine. A price was set, and a meet was scheduled. On that date, Mr. Odie met with Officer Dark to prepare for the buy. Officer Dark searched Mr. Odie's vehicle and his person and provided Mr. Odie with the money to purchase the drugs. Mr. Odie was also equipped with a surveillance device that captured both audio and video of the transaction. He then drove to the home of appellant's sister to complete the transaction. When Mr. Odie drove up, appellant told him that the person from whom he had ordered the cocaine was going to bring it to Mr. Odie. The person delivering the drugs was allegedly traveling from Franklin to Columbia for the transaction. The surveillance showed appellant and Mr. Odie waiting for the person from Franklin to arrive.

Mr. Odie stated that while they waited, he and appellant drove to an address on Elaine Drive to attempt to purchase cocaine from someone there.  Mr. Odie waited in his car while appellant walked up to a residence and returned with what he said was a gram of powder cocaine.  Appellant asked Mr. Odie what he intended to do with the cocaine, and Mr. Odie told him that he planned to sell it.  Mr. Odie explained that he said that to appellant so that he would not have to share it with him.  Mr. Odie and appellant then drove back to appellant's sister's residence.

Mr. Odie testified that after he left the residence, he contacted Officer Dark to let him know that the transaction had been completed.  He met with the officer and relinquished the cocaine.  Mr. Odie explained that the reason that appellant was not clearly pictured in the surveillance video during the time they drove to Elaine Drive was that he did not want it to appear obvious that he was wearing a recording device, which was placed on his left side.  He explained that with the placement of the camera on his left side and with appellant in the passenger's seat of the car, it was difficult to record appellant without "revealing" himself.

On June 20, 2012, Mr. Odie again met with Officer Dark to prepare for an undercover buy from appellant.  Officer Dark followed the same procedures as before and attached the recording device to Mr. Odie in the same location.  Mr. Odie stated that appellant gave him a price for the cocaine and instructed him to meet at appellant's mother's house, which was "[o]ut by Brown School."  Because Mr. Odie was unfamiliar with the location, he telephoned appellant for directions while en route.  After picking up appellant from his mother's location, Mr. Odie and appellant again drove to Elaine Drive, where appellant walked up to the residence as Mr. Odie remained in the vehicle.  Mr. Odie can be heard on the audiotape instructing appellant to "not be in there all day" because it was hot outside.  When the transaction was completed and appellant returned to the vehicle with the cocaine, they drove to appellant's sister's residence.

Mr. Odie testified that on June 28, 2012, he and Officer Dark followed the same procedure and utilized the same recording device as in the previous transactions.  This time, Mr. Odie picked up appellant from the dry cleaner where he was employed and drove him to his mother's residence.  When Mr. Odie arrived at the dry cleaner, appellant had possession of the cocaine, and Mr. Odie paid him the agreed-upon price when they reached his mother's residence.

Mr. Odie stated that the last transaction in which he participated with appellant occurred on July 10, 2012.  Following the same procedures, Mr. Odie planned to meet appellant at his sister's house, where the first transaction occurred.  Officer Dark instructed Mr. Odie to attempt to obtain a better video image of appellant because the previous three videos did not clearly show appellant's face.  When Mr. Odie arrived at the designated location, appellant walked out to Mr. Odie's car, and they conducted the

transaction surreptitiously through the driver's side window of the vehicle. When it was complete, Mr. Odie left and met with Officer Dark.

Mr. Odie confirmed that following each transaction, he immediately met with Officer Dark and turned over the drugs and that he never tampered with or used any of the drugs himself. He also acknowledged that by helping Officer Dark, he hoped to avoid incarceration. Mr. Odie professed that he had changed his life and that he did not want to miss out on his "destiny" and time with his daughter. He also confessed that he was a former member of the Vice Lords gang but reiterated that he was no longer involved with them. He said that he had stopped selling drugs and that he no longer even socialized with gang members. Mr. Odie said that he assisted Officer Dark in obtaining over forty indictments for drug activity.

On cross-examination, defense counsel questioned Mr. Odie with respect to the lack of a clear video depiction of appellant's face during the first drug transaction. Mr. Odie explained that "if you move a certain way or anything like that, that person, if he's smart enough, . . . could tell . . . that object that you're using to record them." He stated that the recording device was in his watch, which he wore on his left hand, and that he could not "just flip this camera over like that[] to where they're going to see what's going on." With regard to the second transaction, Mr. Odie explained that appellant suggested the meeting place near Brown School and that he merely followed appellant's instructions.

The State's next witness was Detective Jason Dark with the Columbia Police Department. Prior to becoming a detective in 2013, he was an investigator in the narcotics division. Detective Dark testified that it was common for the narcotics division to utilize confidential informants ("CI") who were trying to stay out of prison for their own drug charges. When a CI is involved in a drug operation, an officer would meet the CI and search him to be sure he did not have any drugs or money in his possession. The officer would also search the CI's vehicle. The officer would provide an electronic listening device to monitor the CI's safety and video and audio recording equipment, if possible. Before giving money to the CI to purchase drugs, the officer would photocopy the money. Detective Dark stated that he would give the CI a wristwatch containing the recording equipment and that he would allow the CI to choose where to place it. He would instruct the CI to act as "normal as possible."

Detective Dark said that when conducting a transaction, the officer in charge knew where the meet was supposed to occur but that it was not unusual for the meeting place to change during the operation. In fact, he characterized it as "normal" for the location to change during controlled buys. In this case, Detective Dark followed Mr. Odie as closely as possible without being "obvious." He explained that the listening device transmitted what was happening at the current time, whereas the recording device did not emit a

signal that could be monitored. The listening device was used solely for the safety of the CI, and for that reason, Detective Dark needed to be close enough to hear everything and to be able to react if anything should go wrong.

Detective Dark clarified that although he was on Elaine Drive, he was not able to observe the first drug transaction. When Mr. Odie returned to the police department, Detective Dark recovered the cocaine and briefly interviewed Mr. Odie. Thereafter, he logged the cocaine into evidence. He confirmed that the evidence from the first transaction was the cocaine that weighed 0.66 grams per the TBI laboratory.

Detective Dark and Mr. Odie followed the same procedures for the three other drug transactions. The weight of the cocaine from the second transaction was 0.74 grams; from the third transaction, 1.03 grams; and from the fourth and final transaction, 0.86 grams.

Prior to the fourth transaction, Detective Dark emphasized to Mr. Odie the importance of capturing appellant's image on the recording device. He also explained that when analyzing a video for evidentiary purposes, he looked "beyond the obvious of the recording[] and start[ed] relying on mirrors, reflections, anything to help . . . tie in who's in that vehicle with your informant." While the first three videos contained glimpses of appellant's body or clothing, Mr. Odie was successful in capturing a clear image of appellant's face in the fourth video. Detective Dark explained that experienced sellers of drugs could exchange money for drugs very quickly and practically without notice.

Detective Dark confirmed that the transactions that occurred on Elaine Drive fell within a drug-free zone because it was within 1,000 feet of New Harvest Child Care Agency. The residence of appellant's mother was on Cord Drive, which was within 1,000 feet of a Columbia city park. The final transaction at appellant's sister's residence on Granada Drive did not fall within a drug-free zone.

Upon this evidence, the jury convicted appellant of the lesser-included offenses of facilitation of the sale of cocaine in a drug-free zone in Counts I and II and convicted him as charged in Counts III and IV.

## B. Sentencing

Following a sentencing hearing, the trial court sentenced appellant as follows: (1) Count I, facilitation of the sale of cocaine in a drug-free zone, three years; (2) Count II, facilitation of the sale of cocaine in a drug-free zone, three years; (3) sale of cocaine in a drug-free zone, eight years; and (4) sale of cocaine, ten years. The trial court aligned the

first three sentences concurrently, suspended the fourth sentence to supervised probation, and aligned it consecutively to the eight-year sentence of incarceration.[1]

In his unsuccessful motion for a new trial, appellant raised the sole issue that is presented in this appeal:  whether the trial court erred in decling to instruct the jury on the lesser-included offense of simple causal exchange.

## II.  Analysis

Appellant argues that the trial court erred in denying his request for a jury instruction on the lesser-included offense of simple casual exchange.  The State responds that simple casual exchange is not a lesser-included offense of sale of a controlled substance as a matter of law and that even if it were, any error with respect to the failure to so instruct the jury was harmless.  Because the propriety of jury instructions is a mixed question of law and fact, we review this issue *de novo* with no presumption of correctness.  *State v. Smiley*, 38 S.W.3d 521, 524 (Tenn. 2001) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)).

Both the United States and the Tennessee Constitutions guarantee a right to trial by jury. U.S. Const. amend. VI; Tenn. Const. art. I, 6; *Bryant v. State*, ___ S.W.3d___, 2015 WL 1137755, at *6 (Tenn. Mar. 13, 2015).  This includes the "right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." *Bryant*, 2015 WL 1137755, at *6 (quoting *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011)); *see* Tenn. R. Crim. P. 30.  "In determining whether a defense instruction is raised by the evidence, the court must examine the evidence in the light most favorable to the defendant to determine whether there is evidence that reasonable minds could accept as to that defense." *State v. Sims*, 45 S.W.3d 1, 9 (Tenn. 2001).  "In making this determination, the trial court must view the evidence liberally . . . without making any judgments on the credibility of such evidence. . . . [T]he trial court must [also] determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense." *State v. Burns*, 6 S.W.3d 453, 469 (Tenn. 1999); Tenn. Code Ann. 40-18-110(a).  "[T]he constitutional right to trial by jury is violated 'when the jury is not permitted to consider *all* offenses *supported by the evidence*.'" *Bryant*, 2015 WL 1137755, at *6 (alteration in original) (quoting *State v. Ely*, 48 S.W.3d 710, 727 (Tenn. 2001)).  However, "[w]hen the entire charge, read as a whole, fully and fairly sets out the applicable law, the trial judge does

---

[1]  Because appellant was convicted of engaging in the drug transaction within 1,000 feet of a public park (rather than a school zone), he is not subject to additional incarceration pursuant to Tennessee Code Annotated section 39-17-432(b)(1), but his release eligibility is nonetheless governed by the drug-free enhancement statute, *id*. § 39-17-432(c), (d).

not err in denying a special instruction requested by a party or in denying an inaccurate instruction or one inapplicable to the case at hand." *Sims*, 45 S.W.3d at 9.

As indicted in this case, Tennessee Code Annotated section 39-17-417(a)(3) states that it is an offense for a defendant to knowingly sell a controlled substance. A sale consists of "a bargained-for offer and acceptance[] and an actual or constructive transfer or delivery of the subject matter property." *State v. Holston*, 94 S.W. 507, 510 (Tenn. Crim. App. 2002) (citation omitted). The offense is a Class B felony if the substance weighs 0.5 grams or more and contains cocaine. Tenn. Code Ann. § 39-17-417(b). In contrast, a defendant commits an offense when he knowingly possesses or casually exchanges a controlled substance . . . ." *Id.* § 39-17-418(a).

This court has previously concluded that the offense of casual exchange "contemplates a spontaneous passing of a small amount of drugs, for instance, at a party" and that "[m]oney may or may not be involved." *State v. Copeland*, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998). Moreover, "casual exchange occurs when the transfer of the controlled substance is made without design." *State v. Carey*, 914 S.W.2d 93, 96 (Tenn. Crim. App. 1995) (citation omitted).

In light of prevailing case law, we conclude that the offense of casual exchange does not contemplate the type of transactions established by the evidence in this case. The record is lacking in evidence reflecting anything other than a pecuniary motive for the transfer of the cocaine. The amount of cocaine, the price, and the meeting places were clearly established prior to each transaction. There was little to no interaction between appellant and the CI outside of the actual drug transaction. Detective Dark testified that in his experience with illegal drug transactions, the locations of transactions were often changed during the course of the transaction. In short, the evidence in the record reflects nothing less than the sale of cocaine. *See State v. Michael Moore*, No. 02C01-9705-CR-00180, 1997 WL 703343, at *1 (Tenn. Crim. App. Nov. 13, 1997) (noting that the evidence at trial illustrated that appellant was acting with a "definite design" and for pecuniary gain); *State v. David Humphrey*, No. 01C01-9404-CR-00134, 1995 WL 50039, at *2 (Tenn. Crim. App. Feb. 8, 1995) (concluding that evidence that a confidential informant made two fifty dollar purchases of cocaine from the defendant established a "designed sale" and affirming the trial court's refusal to instruct on casual exchange). Thus, appellant's contention is without merit.

## CONCLUSION

Based on our review of the record, the briefs of the parties, and controlling legal authorities, we affirm the judgments of the trial court.

_____
ROGER A. PAGE, JUDGE